UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:_____3/31/16__
```

------------------------------------------------------------ X

WAYNE L. HARDY,                          :
                                          :
                              Plaintiff,  :
                                          :                    14-CV-4007 (VEC)
              -against-                    :
                                          :                    OPINION & ORDER
PEPSI BOTTLING COMPANY OF NEW              :
YORK, INC.,                                :
                                          :
                              Defendant.  :
------------------------------------------------------------ X

VALERIE CAPRONI, United States District Judge:

Plaintiff Wayne Hardy, *pro se*, formerly a warehouse forklift operator and loader,

initiated this action against Defendant Pepsi Cola Bottling Company of New York ("Pepsi"), his

former employer.  Hardy alleges that he was terminated, retaliated against, and falsely accused of

worker's compensation fraud based on his race and his alleged status as a disabled worker, all in

violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*,

and the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12183(a).[1]  Defendant has moved

for summary judgment.  Hardy has not offered any evidence showing that his race, alleged

disability, or participation in protected activity played a role in Pepsi's decision to initiate an

arbitration proceeding that resulted in his employment being terminated.  Accordingly,

Defendant's motion for summary judgment is GRANTED, and the case is DISMISSED.

---

[1]      Hardy did not expressly allege an ADA violation in the Complaint, as he indicated that all claims were
being brought pursuant to Title VII.  Compl. 1 (Dkt. 2).  Later in the Complaint, however, when asked to articulate
his discrimination claim, Hardy checked the box for "disability or perceived disability."  *Id.* ¶ II (B).  Because of his
status as a *pro se* litigant, his claims should be liberally construed to raise "the strongest arguments that they
*suggest.*"  *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994) (emphasis added); *see also Dukes v. Schuck*, No. 13-
3920, 2016 WL 875654, at *1 (2d Cir. Mar. 8, 2016) ("Applying the liberal construction we normally afford to the
submissions of *pro se* litigants, we interpret [plaintiff's] appeal to also encompass the District Court's entry of final
judgment against him four days later." (citations omitted)).  The Court, therefore, construes Hardy's pleadings to
have raised a disability discrimination claim arising under the ADA.

## BACKGROUND[2]

Hardy began working for Pepsi as a seasonal employee in May 2007 and became a full-time warehouse forklift operator and loader ("Hi-Lo operator") in October 2007.  Def. 56.1 Stmt. ¶ 14.  Throughout his employment at Pepsi, Hardy was a member of the union that represented Pepsi workers employed in its greater New York production and maintenance facilities.  *Id*. ¶¶ 12-13.  As a union member, Hardy was covered by a collective bargaining agreement ("CBA"), under which Pepsi was obligated to deal with the union when seeking to discipline an employee. *Id*. ¶ 13.

### I.    Hardy's Employment and Injury History

Hardy operated a forklift to load and unload Pepsi products onto and from delivery trucks.  *Id*. ¶ 15.  Because these functions could only be performed at Pepsi's facilities during work hours, all Hi-Lo operators, including Hardy, were subject to a mandatory attendance policy, *id*. ¶ 18, which was part of the CBA.  *Id*. ¶¶ 12, 17.

Hardy began violating the attendance policy in 2010.  *Id*. ¶ 20.  He received a written warning on April 14, 2010 for excessive absenteeism and was informed by his supervisor, Larry Broderick, that further absenteeism would trigger additional disciplinary measures.  *Id*. ¶¶ 20-21. Several months later his attendance had failed to improve, and Hardy was notified by Broderick

---

[2]    The Court's account of the facts is based upon Pepsi's Rule 56.1 Statement ("Def. 56.1 Stmt.") (Dkt. 36). Pursuant to S.D.N.Y. Local Rule 56.1, Hardy had the opportunity to submit a Rule 56.1 Statement to respond to Pepsi's assertions of undisputed facts.  *See* S.D.N.Y. Local Rule 56.1(b).  Both Pepsi and the Court have provided Hardy ample notice of his opportunity to respond to Pepsi's Rule 56.1 Statement: Pepsi filed a notice on September 4, 2015, advising Hardy of the risks inherent in failing to respond (Dkt. 37), and the Court granted Hardy an extension of time to respond and directed him to an electronic manual that could have assisted him in generating a response (Dkt. 39).  The Court later gave Hardy a second extension of time to respond to Pepsi's motion and again advised it would be in his best interest to file a substantive response (Dkt. 46).  Nonetheless, Hardy failed to provide a substantive response.  Because he did not submit a Rule 56.1 Statement, the Court is justified in relying solely on Pepsi's submission.  *See* S.D.N.Y. Local Rule 56.1(c) ("[M]aterial facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party.").

that, moving forward, he had to notify his supervisor if he was going to be late for work.  *Id.* ¶ 23.  Hardy's attendance issues continued into 2011, and he received a final warning on July 29, 2011, for excessive absenteeism.  *Id.* ¶¶ 24-26.  Broderick also notified Hardy that failure to improve his attendance would result in further disciplinary action.  *Id.* ¶ 28.

Hardy injured his shoulder during a workplace accident in February 2012, and, as a result, he took approved worker's compensation leave until November 20, 2012.  *Id.* ¶ 29.  Before he returned to work, Hardy underwent a Functional Capacity Evaluation, which determined that he had no lingering limitation or restrictions on his ability to perform the essential functions of his job, *id.* ¶¶ 30-31, a fact that Hardy confirmed during his deposition on December 11, 2014, *id.* ¶ 32; Declaration of Anthony A. Mingione ("Mingione Decl.") Ex. 4, pt. 1,[3] at 55 (Dkt. 35-5). [4]

Upon his return to work, Hardy continued to violate the attendance policy.  Def. 56.1 Stmt. ¶ 37.  By April 2013, Pepsi had decided to initiate arbitration in order to terminate Hardy's employment due to his continued, excessive absenteeism.  *Id.* ¶ 42.  Hardy was notified of this development in a letter he received on April 24, 2013, *id.* ¶ 43, and he understood at the time that his job was in jeopardy, *id.* ¶ 44.

On July 8, 2013, Hardy allegedly injured his toe while on the job, missed work the following day, and scheduled a doctor's appointment for July 15, the day of his scheduled arbitration hearing.  *Id.* ¶¶ 46-49.  Pepsi agreed to reschedule the hearing for August 26, 2013; *id.* ¶ 50, Hardy, however, filed a second worker's compensation claim on August 13, 2013, relating

---

[3]     Some of Pepsi's documentary exhibits are divided into multiple parts (i.e., Exhibit 2, Part 1; Exhibit 2, Part 2), each with its own docket entry.  To avoid confusion, the Court cites specifically to the exhibit and its respective part when citing to an exhibit that has been divided into parts.

[4]     When asked whether he was able to perform his job duties as of November 20, 2012, Hardy replied "Yes."  Mingione Decl. Ex. 4, pt. 1, at 130.  When further probed whether there were lingering restrictions on or problems with his ability to perform because of the shoulder injury, he answered "No."  *Id.*

to an alleged incident the day prior in which he claimed to have re-aggravated his shoulder injury, *id*. ¶¶ 50-52.  The following day, August 14, 2013, Hardy posted a comment to his Facebook account alluding to the fact that he had filed the new worker's compensation claim to delay the arbitration hearing.[5]  *Id*. ¶ 53.  Upon learning of the Facebook post, Pepsi added charges of dishonesty and worker's compensation fraud to its arbitration demand as additional instances of misconduct warranting Hardy's termination.  *Id*. ¶ 54.

## II.      Hardy's Arbitration Hearing

Hardy's arbitration hearing was eventually held before an independent arbitrator on September 17, 2013.  *Id*. ¶¶ 55-56.  Hardy was afforded the opportunity to offer evidence and to testify in support of his contention that he should remain employed.  *Id*. ¶¶ 58-60.  Although the arbitrator found that the charge of excessive absenteeism was substantiated, he concluded that it was, by itself, insufficient to merit termination.  *Id*. ¶ 59.  Nevertheless, the arbitrator recommended termination because the "substantiated charge of dishonesty carrie[d] no second chances" and gave "sufficient cause for [Hardy's] immediate discharge."  *Id*. ¶¶ 59-60.  Accordingly, Pepsi terminated Hardy on October 3, 2013.  *Id*. ¶ 62.  At no point during the arbitration hearing did Hardy or his union representative claim that Hardy's race or disability factored into Pepsi's actions, nor is there any mention of any such allegations in the arbitration decision.  *Id*. ¶ 61.

## DISCUSSION

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

---

[5]      In pertinent part, the Facebook post stated: "God is good and he kept me strong no matter situation I'm focus it be struggle at times but I'm like dodge ram truck I'm built tough mad bcuz [sic] I had surgery on my left and still in my shoulder I went out on comp Monday why bcuz [sic] I'm brilliant Blackman [sic] guarantee they gone [sic] fire me on aug 26 at my arbitration case . . ."  Def. 56.1 Stmt. ¶ 53; Mingione Decl. Ex. 4, pt. 5, at 6 (Dkt. 35-9).

R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  "'Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'"  *Scott v. Harris*, 550 U.S. 372, 380 (2007) (quotation marks omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)).  "The Court must 'construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant.'"  *Pandora Media, Inc. v. Am. Soc'y of Composers, Authors and Publishers*, 785 F.3d 73, 77 (2d Cir. 2015) (*per curiam*) (quoting *Beyer v. Cnty. of Nassau*, 524 F.3d 160, 163 (2d Cir. 2008)).  Nevertheless, "to defeat summary judgment, 'a nonmoving party must offer some hard evidence showing that its version of the events is not wholly fanciful.'"  *Chabad Lubavitch of Litchfield Cnty., Inc. v. Litchfield Historic Dist. Comm'n*, 768 F.3d 183, 197 n.10 (2d Cir. 2014) (quoting *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005)).

When a party moves for summary judgment against a *pro se* litigant, courts afford the non-moving party "special solicitude."  *Tracy v. Freshwater*, 623 F.3d 90, 101 (2d Cir. 2010).  District courts must read a *pro se* litigant's "pleadings liberally and interpret them to raise the strongest arguments that they suggest."  *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 50 (2d Cir. 2003) (quotation marks and citations omitted).  Courts "are less demanding of [*pro se*] litigants generally, particularly where motions for summary judgment are concerned."  *Jackson v. Fed. Express*, 766 F.3d 189, 195 (2d Cir. 2014).  This lower standard for *pro se* plaintiffs does not, however, "relieve plaintiff of his duty to meet the requirements necessary to defeat a motion for summary judgment."  *Jorgensen*, 351 F.3d at 50 (quotation marks and citations omitted).

Hardy alleges that he suffered adverse employment actions because he is African-American and because he was disabled for periods of time during his employment by Pepsi.  Additionally, he alleges that he was retaliated against for making a charge of discrimination.

Compl. 3 ¶ II (A), (D).  Because Hardy has offered no evidence that any of the adverse actions taken against him were motivated by discriminatory or retaliatory animus and has not refuted Pepsi's proffered non-discriminatory reasons for its actions, Pepsi is entitled to summary judgment.

### I. Hardy's Discrimination Claims

Claims arising under Title VII and the ADA "are governed at the summary judgment stage by the burden-shifting analysis first established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973)." *Tolbert v. Smith*, 790 F.3d 427, 434 (2d Cir. 2015); *see Delaney v. Bank of Am. Corp.*, 766 F.3d 163, 167 (2d Cir. 2014) (*per curiam*).  "Under *McDonnell Douglas*, a plaintiff bears the initial burden of proving by a preponderance of the evidence a prima facie case of discrimination; it is then the defendant's burden to proffer a legitimate non-discriminatory reason for its actions; the final and ultimate burden is on the plaintiff to establish that the defendant's reason is in fact pretext for unlawful discrimination." *Abrams v. Dep't of Public Safety*, 764 F.3d 244, 251 (2d Cir. 2014).  "Where an employer has acted with discriminatory intent, direct evidence of that intent will only rarely be available, so that 'affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination.'" *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008) (quoting *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994)).  "Even in the discrimination context, however, a plaintiff must provide more than conclusory allegations to resist a motion for summary judgment." *Id.*

### A. Disability

There is no evidence that Hardy was "disabled" as that term is defined by the ADA.  "To establish a prima facie case under the ADA, a plaintiff must show by a preponderance of the evidence that: (1) his employer is subject to the ADA; (2) he was disabled within the meaning of

the ADA; (3) he was otherwise qualified to perform the essential functions of his job, with or

without reasonable accommodation; and (4) he suffered adverse employment action because of

his disability." *McMillan v. City of New York*, 711 F.3d 120, 125 (2d Cir. 2013) (quoting *Sista v.

CDC Ixis N. Am., Inc.*, 445 F.3d 161, 169 (2d Cir. 2006)).  The parties do not dispute the first

element, but the remaining three are at issue.

     **1.   Employee Disability Status Under the ADA**

     An individual is disabled under the ADA "if he or she has an actual disability, defined as

(1) 'a physical or mental impairment that substantially limits one or more major life activities;'

(2) having 'a record of such an impairment;' or (3) 'being regarded as having such an

impairment.'" *Louis v. N.Y.C. Hous. Auth.*, 15-Civ.-3122 (NRB), 2016 WL 297563, at *4

(S.D.N.Y. Jan. 14, 2016) (quoting 42 U.S.C. § 12102(1)).  While the ADA mandates

construction "in favor of broad coverage of individuals," 42 U.S.C. § 12102(4)(A), "[a] medical

condition alone, even a serious one, is not a *per se* disability under the ADA; it must

substantially limit a major life activity." *Pagan v. Morrisania Neighborhood Family Health

Ctr.*, 12-Civ.-9047(WHP), 2014 WL 464787, at *4 (S.D.N.Y. Jan. 22, 2014) (citing *Anvan v.

N.Y. Life Ins. Co.*, 192 F. Supp. 2d 228, 244-45 (S.D.N.Y. 2002)).  Hardy has not even alleged,

let alone demonstrated, that his medical conditions substantially limited any major life activities

or that Pepsi regarded him as having any such limiting medical conditions.

     Hardy suffered from three injuries or medical conditions during the relevant time period.

First, he injured his shoulder in a workplace accident in February 2012 and subsequently took

slightly over nine months of approved worker's compensation leave to recover.  Def. 56.1 Stmt.

¶ 29.  On July 8, 2013, he allegedly dropped a 1.5 liter bottle of water on his toe and took the

following day off from work.  *Id.* ¶¶ 46-47.  Finally, he allegedly re-aggravated his shoulder

injury while at work on August 12, 2013, requested worker's compensation leave on August 13,

and, that same day, was medically cleared to resume his duties the following week with no physical restrictions. *Id.* ¶¶ 51-52; Mingione Decl. Ex. 2, pt. 1, at 28 (Dkt. 35-2). None of these three injuries rises to the level of a qualifying disability under the ADA.

Both of his 2013 alleged injuries fall well outside of ADA coverage. "'[S]hort-term, temporary restrictions are not substantially limiting and do not render a person disabled.'" *Sternkopf v. White Plains Hosp.*, No. 14-CV-4076 (CS), 2015 WL 5692183, at *6 (S.D.N.Y. Sept. 25, 2015) (quoting *Ragusa v. Malverne Union Free Sch. Dist.*, 582 F. Supp. 2d 326, 341 (E.D.N.Y. 2008) (citations and quotation marks omitted)). The very short-term nature of these two alleged injuries precludes their classification as a disability under the ADA. *See Colwell v. Suffolk Cnty. Police Dept.*, 158 F.3d 635, 646 (2d Cir. 1998) ("[A] seven-month impairment of [plaintiff's] ability to work, with the non-particularized and unspecific residual limitations described on his police work, is of too short a duration and too vague an extent  to be 'substantially limiting.'"). Hardy's alleged toe injury, resulting in a one-day absence from work and causing no discernible residual limitations, is insufficient to constitute a disability under the ADA. The re-aggravation of Hardy's earlier shoulder injury is similarly lacking. Setting aside the dubious nature of the alleged re-injury given its temporal proximity to Hardy's upcoming arbitration hearing and his Facebook post that strongly implied his worker's compensation claim was a delaying tactic, the alleged re-injury itself was too temporary to qualify as a substantially limiting, ADA-protected disability.

While Hardy's February 2012 shoulder injury potentially has more merit than his two other alleged injuries, it too fails to qualify as a disability under the ADA. Hardy's worker's compensation leave for this injury lasted over nine months, from February 2012 through November 21, 2012. Def. 56.1 Stmt. ¶¶ 29, 31. The duration of the injury alone, however, is not the dispositive factor in analyzing whether a person is disabled under the ADA; "[i]t is the

limitation on the claimed major life activity that must be permanent or have a long term impact."
*Levine v. Smithtown Cent. Sch. Dist.*, 565 F. Supp. 2d 407, 423 (E.D.N.Y. 2008).  Here, Hardy
has not claimed that the shoulder injury had a permanently limiting effect on his ability to
perform or engage in major life activities.  To the contrary, he admitted during his deposition that
he was not disabled, Mingione Decl. Ex. 4, pt. 1, at 109, and admitted that he had no lingering
restrictions on his ability to perform critical work functions by the time he returned to work on
November 21, 2012.  *Id.* at 130.  Hardy also underwent a Functional Capacity Evaluation prior to
returning to work after disability leave, and the evaluation concluded he was capable of
performing his full-time job duties with no substantial limitations.  Def. 56.1 Stmt. ¶¶ 30-31;
Mingione Decl. Ex. 2, pt. 2, at 9 (Dkt. 35-3).  In short, Hardy's shoulder injury is not a
"disability" under the ADA.

The two other ways by which a plaintiff may show an ADA-qualifying disability are not
applicable.  A "record of . . . [a qualifying] impairment" is sufficient to prove a person suffers
from a disability.  42 U.S.C. § 12102(2).  Hardy has not argued that such a record exists, but
hospital records and doctor bills associated with his shoulder surgery and subsequent check-ups
are available.  Mingione Decl. Ex. 2, pt. 2 at p. 9-14.  While "hospitalization is certainly a *record*
of an impairment [and] … every instance of hospitalization is disabling in the sense that one
cannot go to work," such incidences must also "show that the impairment [requiring
hospitalization] impos[ed] a substantial limitation on one or more of [a patient's] major life
activities."  *Colwell*, 158 F.3d at 646.  Hardy has not and cannot do so.  Although his surgery and
various follow-up visits to orthopedists and other health care professionals comprise a "record of
impairment," Hardy himself denied that he suffered long-term restrictions on his ability to do his
job and conceded that he was not disabled.  Mingione Decl. Ex. 4, pt. 1, at 109.  Hardy's medical

records alone, therefore, do not create a question of fact whether he was disabled under the ADA.

Nor is there any evidence that Pepsi regarded him as having a disability.  "[W]hether an individual is 'regarded as' having a disability 'turns on the employer's perception of the employee' and is therefore 'a question of intent, not whether the employee has a disability.'" *Colwell*, 158 F.3d at 646 (quoting *Francis v. City of Meriden*, 129 F.3d 281, 284 (2d Cir. 1997)). The employer, moreover, must not simply regard the employee "as somehow disabled; rather, the plaintiff must show that the employer regarded the individual as disabled *within the meaning of the ADA*." *Id*. (citation omitted).  "There are two apparent ways in which individuals may fall within this statutory definition: (1) a covered entity mistakenly believes that a person has a physical impairment that substantially limits one or more major life activities, or (2) a covered entity mistakenly believes that an actual, nonlimiting impairment substantially limits one or more major life activities." *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 489 (1999).  Thus, there would need to be some evidence that Pepsi regarded Hardy as having an impairment that substantially limited one or more major life activities in order for this method of proof to be applicable.

Prior to Hardy's return from leave in November 2012, he was evaluated and deemed to be fully capable of performing his job responsibilities with no physical restrictions.  Def. 56.1 Stmt. ¶ 31.  Additionally, before Hardy returned to work after the alleged re-injury of his shoulder in August 2013, Pepsi received a work release from a nurse practitioner who examined Hardy on August 13, 2013.  The Nurse Practitioner indicated that Hardy was able to return to work with no physical restrictions.  Mingione Decl. Ex. 2, pt. 2, at 9.  Because Hardy had been medically cleared to resume his full responsibilities following both of his shoulder injuries, there is simply no evidence that Pepsi regarded Hardy as disabled.  And as to the toe injury he

allegedly suffered on July 8, 2013, Hardy missed only one day of work and returned to work on July 10. Def. 56.1 Stmt. ¶ 47. Given the circumstances and extremely short-term nature of this alleged injury, Hardy cannot show that Pepsi regarded it as anything more than an attempt to delay the arbitration hearing, let alone regarded it as an ADA-protected disability.

Pepsi did, however, temporarily assign Hardy to the lower-volume overnight shift upon his return to work in November 2012 in order to allow him to re-accustom himself to the physical rigor of his job. Def. 56.1 Stmt. ¶ 6. Such an action could potentially be viewed as having been done in response to a mistaken perception that Hardy was disabled within the meaning of the ADA. *See Sutton*, 527 U.S. at 489. Here, however, any such argument would fail (and, it is worth noting, Hardy has not raised this argument). "[I]t is not enough that [an employer] perceived [an employee] as substantially limited in his ability to perform a particular job; instead, it must have believed he was 'significantly restricted in the ability to perform either a class of jobs or a broad range of jobs . . . as compared to the average person having comparable training, skills and abilities.'" *Williams v. Long Island R.R. Co.*, 618 F. App'x 716, 719 (2d Cir. 2015) (quoting *Bartlett v. N.Y. State Bd. of Law Exam'rs*, 226 F.3d 69, 82 (2d Cir. 2000)). Hardy's assignment to a lighter shift was only temporary, and he eventually resumed his former daytime duties a few months later. Def. 56.1 Stmt. ¶ 36. The fact that Pepsi returned Hardy to his old position after a brief re-acclimation period refutes any potential argument Hardy might have that Pepsi regarded him as unfit to assume a broad range of jobs within its facilities. Nor

11

did the temporary assignment itself evince a perception on the part of Pepsi that Hardy was

substantially limited in performing any job that required a certain degree of physicality.

In short, there is simply no evidence that Hardy was disabled, a necessary element of an

ADA discrimination claim.

## 2.   Adverse Employment Action Taken Because of Employee's Disability

Beyond the fact that there is no evidence that Hardy was or was perceived to be disabled,

there is no evidence that he suffered an adverse employment action as a result of his disability.

The Second Circuit defines an adverse employment action as "a materially adverse change in the

terms and conditions of employment." *Sanders v. N. Y.C Human Res. Admin.*, 361 F.3d 749, 755

(2d Cir. 2004) (quotation marks omitted).   "To be materially adverse, a change in working

conditions must be more disruptive than a mere inconvenience or an alteration of job

responsibilities." *Mathirampuzha v. Potter*, 548 F.3d 70, 78 (2d Cir. 2008) (citation omitted).

Hardy suffered adverse employment actions when Pepsi initiated arbitration in April

2013 in order to terminate his employment, *see Adamczyk v. New York Dep't. of Corr. Servs.*,

474 Fed. App'x 23, 25 (2d Cir. 2012), and when he was terminated, *see Sanders*, 361 F.3d at 755

("Examples of … [an adverse employment action] include 'termination of employment.'")

(quoting *Terry v. Ashcroft*, 336 F.3d 128, 138 (2d Cir. 2003))).[6]  The existence of an adverse

---

[6]     The Complaint appears to claim that his termination was the only adverse action about which he is suing. Nevertheless, it is worth noting that Pepsi's decision to assign Hardy to the less physically demanding overnight shift upon his return to work in November 2012 was not an adverse employment action.  A reassignment to a less desirable position can constitute an adverse employment action, but "'not every unpleasant matter short of [discharge or demotion] creates a cause of action' for retaliatory discharge." *Wanamaker v. Columbian Rope Co.*, 108 F.3d 462, 466 (2d Cir. 1997) (quoting *Welsh v. Derwinski*, 14 F.3d 85, 86 (1st Cir. 1994)).  Here, the reassignment was not a demotion, nor did it entail a decrease in Hardy's salary or benefits.  As such, Hardy's temporary reassignment to a lighter shift undertaken with the intent to ease him back into his job following an extended absence fails to rise to the level of an adverse employment action.  *See Leget v. Henderson*, No.-99-CIV.-3636 (DLC), 99-CIV.-4610 (DLC), 2001 WL 43615, at *6 (S.D.N.Y. Jan. 18, 2001) ("[Plaintiff's] three-week assignment to [a different] shift resulted in no change in [her] salary, title, or benefits" and, therefore, was not an adverse employment action.).

employment action alone, however, is not enough for a plaintiff to survive a motion for summary

judgment.  "[T]o state a claim of employment discrimination under the ADA, a plaintiff must

plausibly allege that . . . the action was taken *because of* her disability or perceived disability."

*Jones v. Target Corp.*, 15-CV-4672 (MKB), 2016 WL 50779, at \*5 (E.D.N.Y. Jan. 4, 2016).

Here, there is no evidence that either adverse action was motivated by Hardy's alleged disability;

there is, however, overwhelming evidence that the adverse actions were motivated by his well-

documented chronic absenteeism.

     Hardy's problems getting to work on time or at all began well before he injured his

shoulder in February 2012.  He first received a written warning in April 2010, and he admitted

that his excessive absences provided Pepsi with "a legitimate reason" to give him a warning.[7]

Def. 56.1 Stmt. ¶¶ 20, 22; Mingione Decl. Ex. 4, pt. 1, at 55.  Despite the warning, Hardy's

attendance problems persisted.  In July 2010, special restrictions were imposed requiring him to

inform his supervisor any time he would be late to work.  Def. 56.1 Stmt. ¶ 23.  Again his

absenteeism problems persisted, and on July 29, 2011, Pepsi issued a final warning.  *Id*. ¶ 24.

     After returning from injury leave in November 2012, Hardy continued to exceed the

permissible number of absences, leading to Pepsi's eventual decision on April 24, 2013, to seek

his termination.  *Id*. ¶¶ 37-38, 42-44.  On April 24, 2013, the only disability from which Hardy

could possibly have been suffering was his February 2012 shoulder injury.  Setting aside the fact

that this injury did not qualify Hardy as disabled under the ADA, there is no evidence that Pepsi

acted against Hardy because of that injury.  In light of Hardy's continual, documented

absenteeism, for which he had been issued several warnings and given several opportunities to

---

[7]    In his deposition, Hardy acknowledged that "[t]he [pattern of absenteeism] in 2010 was a legitimate reason to get a warning because of my attendance, I understand."  Mingione Decl. Ex. 4, pt. 1, at 55.

improve, no reasonable fact finder could conclude that Pepsi initiated termination procedures *because* of his alleged disability.

Nor is there any evidence that Hardy's actual termination was the result of any alleged disability.  Even if Hardy's three injuries constituted a disability, there is no evidence that any or all caused his termination.  Both the toe injury and the shoulder re-injury arose after Pepsi had decided to seek Hardy's termination.  No reasonable fact finder could conclude that Pepsi, after having already chosen to terminate Hardy, was motivated to do so by those two minor alleged injuries.  Additionally, Pepsi had evidence that Hardy either faked or exaggerated his second shoulder injury in an attempt to delay the arbitration hearing.  *Id*. ¶ 53.  That evidence caused Pepsi to amend its arbitration demand to include two additional charges (dishonesty and worker's compensation fraud) to support its proposal to terminate Hardy.  *Id*. ¶ 54.  While the amendment of the arbitration demand to include additional, far more serious charges is an adverse employment action by Pepsi, *see Adamczyk*, 474 Fed. App'x at 25, there is no evidence to suggest that Pepsi took those steps because of any of Hardy's alleged disabilities.

Finally, and most important, the termination decision itself was made by an independent arbitrator following a hearing at which Hardy was represented by his union and was given the opportunity to present evidence and offer testimony in his defense.  Def. 56.1 Stmt. ¶¶ 56-59.  In such circumstances, Hardy faces a higher burden to show that his termination was motivated by his alleged disabilities.

> "[A] decision by an independent tribunal that is not itself subject to a claim of bias will attenuate a plaintiff's proof of the requisite causal link.  Where, as here, that decision follows an evidentiary hearing and is based on substantial evidence, the . . . plaintiff, to survive a motion for summary judgment, must present strong evidence that the decision was wrong as a matter of fact—e.g. new evidence not

before the tribunal—or that the impartiality of the proceeding was somehow compromised."

*Collins v. New York City Transit Auth.*, 305 F.3d 113, 119 (2d Cir. 2002).  Hardy has offered no new evidence that calls into question the substantive decision of the arbitrator, nor has he offered any evidence that the neutrality of the arbitrator was compromised.  There is, therefore, no basis on which to conclude that Pepsi terminated Hardy because of his alleged disabilities.

### B.  Race

To prove a prima facie showing of race discrimination, "the plaintiff must demonstrate that: (1) []he fell within a protected class under Title VII; (2) []he was qualified for the position []he held; (3) []he was subjected to an adverse employment action; and (4) the adverse action occurred under circumstances giving rise to an inference of discrimination."  *Robinson v. Concentra Health Servs., Inc.*, 781 F.3d 42, 45 (2d Cir. 2015).  Construing Hardy's pleadings liberally, he alleges that he was treated differently than similarly situated employees outside of his protected class because he is African-American.  Compl. 3 ¶ II (D).  "A showing of disparate treatment—that is, a showing that the employer treated plaintiff 'less favorably than a similarly situated employee outside his protected group'—is a recognized method of raising an inference of discrimination for purposes of making out a *prima facie* case."  *Mandell v. Cnty. of Suffolk*, 316 F.3d 368, 379 (2d Cir. 2003) (quoting *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000)).  Hardy, however, has offered no evidence that he was subjected to disparate treatment by Pepsi.

Hardy has asserted that three employees, Vito Polomoca, Ian Greenberg, and Gairo Gomez, were treated more favorably than him despite engaging in similar misconduct.  Mingione Decl. Ex. 2, pt. 1, at 17.  This allegation fails for two reasons.  First, the Complaint does not state the race of any of those three men, and it is therefore impossible to determine

whether any alleged disparate treatment implies a racial preference by Pepsi.  Second, there is no

evidence that any of the three were similarly situated to Hardy.  "[A]dverse actions taken against

employees who are not similarly situated cannot establish an inference of discrimination."

*Littlejohn v. City of New York*, 795 F.3d 297, 312 (2d Cir. 2015).  "'The standard for comparing

conduct requires a reasonably close resemblance of the facts and circumstances of plaintiff's and

comparator's cases . . . .'"  *Ruiz v. Cnty. of Rockland*, 609 F.3d 486, 494 (2d Cir. 2010)

(alteration omitted) (quoting *Graham*, 230 F.3d at 40).  "In other words, the comparator must be

similarly situated to the plaintiff 'in all material respects.'"  *Id.* (quoting *Shumway v. United*

*Parcel Serv., Inc.*, 118 F.3d 60, 64 (2d Cir. 1997)).

Polomoca and Greenberg appear to have requested and received leave under the Family

and Medical Leave Act ("FMLA") after having exhausted all of their permitted sick days.

Mingione Decl. Ex. 2, pt. 1, at 17.  Nowhere has Hardy alleged that he was denied FMLA leave,

or that Polomoca and Greenberg's supposed attendance problems were similar to his own.  These

glaring evidentiary lapses preclude Hardy from claiming that Polomoca and Greenberg were his

comparators.  *See Dawson v. Hudson Valley DDSO/OPWDD*, No. 11-CV-8030 (VB), 2015 WL

2330298, at *5 (S.D.N.Y. Apr. 14, 2015) (dismissing disparate treatment racial discrimination

claim because "plaintiff has offered no evidence other employees reporting to [a supervisor]

were as frequently late as plaintiff was and, thus, warranted similar scrutiny").  Moreover,

Hardy has not alleged—let alone adduced evidence to demonstrate—that Polomoca, Greenberg,

or Gomez[8] were accused of worker's compensation fraud and subsequently terminated for

---

[8]        Gomez is listed in Hardy's New York State Division of Human Rights Complaint, which he attached as an
exhibit to the Complaint in this action, as a comparator apparently because he was immediately reinstated to his
former shift upon returning from worker's compensation leave, Mingione Decl. Ex. 2, pt. 1, at 17 , whereas Hardy
was temporarily assigned to an overnight shift at the warehouse after his return from shoulder surgery, Def. 56.1
Stmt. ¶¶ 35-36.  As the Court has previously discussed, *see* note 6 *supra*, Hardy's temporary reassignment was not
an adverse employment action.  The shift reassignment, accordingly, cannot be the basis for a prima facie racial

16

dishonesty (as he was).  Given this material difference in the respective circumstances of Hardy and his alleged comparators, Hardy cannot show that he was similarly situated to any of those three employees "in all material respects."  *See Shumway*, 118 F.3d at 64.

In regards to the various absenteeism-related discipline imposed upon Hardy, there is also no evidence that he was treated worse than other chronically absent employees because of his race.  Between November 2, 2012 and April 19, 2013, Hardy's supervisor disciplined fifteen employees for attendance problems.  Def. 56.1 Stmt. ¶ 39.  The racial breakdown of the disciplined employees was roughly proportional to the overall racial make-up of all Hi-Lo operators at the warehouse.  *Id*. ¶¶ 40-41.  Although there may be some room to quarrel with Pepsi's statistics, [9] Hardy has adduced no evidence that attendance-related discipline was disproportionately meted out based on the race of frequently-absent employees.  Because he has presented no evidence to create a jury question whether he was treated differently than similarly situated non-African American employees with serious absenteeism problems, Hardy has failed to establish a prima facie case of racial discrimination.

Even if Hardy had established a prima facie case of racial discrimination, this claim nevertheless cannot survive Pepsi's motion for summary judgment.  Once a plaintiff establishes a prima facie case, "'the defendant must clearly set forth, through the introduction of admissible evidence,' reasons for its actions which, *if believed by the trier of fact,* would support a finding that unlawful discrimination was not the cause of the employment action."  *St. Mary's Honor*

---

discrimination claim, which requires the plaintiff to have suffered an adverse employment action.  *See Johnson v. New York City Dep't of Educ.*, No. 14-3576-CV, 2016 WL 641341, at *1 (2d Cir. Feb. 18, 2016).

[9]      Although Pepsi asserts in its Rule 56.1 Statement that the racial background of employees disciplined for attendance issues was roughly the same as the racial background of Hi-Lo operators at the facility, Def. 56.1 Stmt. ¶¶ 40-41, it is unknown whether all of the disciplined employees were Hi-Lo operators or whether there were other job categories included in the universe of disciplined employees.

*Ctr. v. Hicks*, 509 U.S. 502, 507 (1993) (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 255 (1981)). "If the employer carries this burden, the burden shifts back to the plaintiff to demonstrate by competent evidence that 'the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.'" *Patterson v. Cnty. of Oneida, N.Y.*, 375 F.3d 206, 221 (2d Cir. 2004) (quoting *Texas Dep't of Cmty. Affairs*, 450 U.S. at 253)). Pepsi has shown that it had legitimate, non-discriminatory reasons for terminating Hardy—namely, Hardy's well-documented chronic absenteeism, as well as dishonesty and worker's compensation fraud as implied in his Facebook post. Hardy, moreover, has failed to present any evidence that those reasons were pretext for racial discrimination. To the contrary, he has acknowledged his lengthy record of absenteeism, Mingione Decl., Ex. 4, pt. 1, at 55, and does not dispute that his Facebook post was evidence of his dishonesty. *Id*. at 163-64. By failing to contest and, at times, conceding that he engaged in the behavior that comprised Pepsi's non-discriminatory reasons for seeking his termination, Hardy cannot create a question of fact whether Pepsi's bases for initiating arbitration proceedings against him were pretextual.

## II. Hardy's Retaliation Claim

Hardy alleges that Pepsi retaliated against him for protected activity.[10] Compl. 3 ¶ II (A). Like discrimination claims, "retaliation claims are reviewed under the burden-shifting approach

---

[10] In his complaint to the New York State Division of Human Rights, Hardy alleged that George Encarnacion, a fellow Pepsi employee and union member, harassed him by contending that Hardy would be terminated for having complained about his treatment to Pepsi's human resources department. Mingione Decl. Ex. 2, pt.1, at 10. He has not reiterated this claim expressly in his federal complaint; however, the Court will consider the allegation in light of Hardy's *pro se* status. Regardless of Encarnacion's motives for allegedly harassing Hardy, such conduct does not constitute retaliation. While "[a]n employee could suffer a materially adverse change in the terms and conditions of [his] employment if [his] employer knew about but failed to take action to abate retaliatory harassment inflicted by co-workers," *Richardson v. N.Y. State Dep't. of Corr. Serv.*, 180 F.3d 426, 446 (2d Cir. 1999), Hardy has not alleged that Pepsi allowed or acquiesced in any type of retaliatory harassment. Absent evidence of such acquiescence by Pepsi, Encarnacion's alleged harassment alone cannot create a prima facie case of retaliation. Nor does Encarnacion's alleged comment even rise to the level of retaliatory harassment necessary to make out such a claim. "[I]ncidents must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive." *McWhite v. New York City*, No.-05-CV-0991 (NH) (LB), 2008 WL 1699446, at *14 (E.D.N.Y. Apr. 10, 2008). Hardy has not claimed that Encarnacion's harassment was persistent, rather; he cites only one instance in

of *McDonnell Douglas*." *Kwan v. Andalex Grp.*, 737 F.3d 834, 843 (2d Cir. 2013).  "To make

out a *prima facie* case of retaliation, a plaintiff must demonstrate that '(1) []he engaged in

protected activity; (2) the employer was aware of that activity; (3) the employee suffered a

materially adverse action; and (4) there was a causal connection between the protected activity

and that adverse action.'"  *Kelly v. Howard I. Shapiro & Assocs. Consulting Eng'rs, P.C.*, 716

F.3d 10, 14 (2d Cir. 2013) (*per curiam*) (quoting *Lore v. City of Syracuse*, 670 F.3d 127, 157 (2d

Cir. 2012)).  Defendant concedes that the first three prongs of the test have been met but argues

that Hardy has not demonstrated the necessary causation required by the fourth and final element

of the prima facie case.

Hardy first engaged in protected activity on July 10, 2013, when he filed a complaint

with the New York State Division of Human Rights alleging that he had been discriminated

against on the basis of his race and disability.  Mingione Decl. Ex. 1, at 6 (Dkt. 35-1).  By then,

however, Pepsi had already initiated the arbitration proceeding that ultimately resulted in

Hardy's termination.  Pepsi had, in fact, resolved to seek his termination as early as April 2013,

when it began the arbitration process.  Def. 56.1 Stmt. ¶ 43.  Pepsi, therefore, cannot have

retaliated against Hardy for protected activity engaged in on July 10 when the alleged retaliatory

act began three months earlier.  This temporal discrepancy destroys any inference of a causal

connection between the protected activity and the adverse action.  *See Slattery v. Swiss

Reinsurance Am. Corp.*, 248 F.3d 87, 95 (2d Cir. 2001), *as amended*, (June 6, 2001) ("Where

timing is the only basis for a claim of retaliation, and gradual adverse job actions began well

before the plaintiff had ever engaged in any protected activity, an inference of retaliation does

not arise."); *John v. Kingsbrook Jewish Med. Ctr./Rutland Nursing Home*, No. 11-CV-3624

---

which Encarnacion threatened termination for complaining to human resources.  Accordingly, this aspect of Hardy's
retaliation claim cannot survive summary judgment.

(MKB), 2014 WL 1236804, at *20 (E.D.N.Y. Mar. 25, 2014) ("All of the adverse actions

identified by Plaintiff . . . occurred or began before any protected activity and, therefore, Plaintiff

cannot rely on temporal proximity to support an inference of retaliation.").

Pepsi did amend its arbitration demand after Hardy engaged in protected activity when it

learned of Hardy's August 14, 2013 Facebook post.  While adding more serious charges to a

pending disciplinary case against an employee is a materially adverse action, there is no evidence

Pepsi did so in response to Hardy's protected activity over one month earlier.  Rather, the only

evidence before the Court is that Pepsi reacted to new information it had obtained regarding

further misconduct by an employee whose termination it already sought.  Liberal construction of

Hardy's claim, however, requires considering whether causation may be inferred solely by the

temporal proximity between his protected activity and Pepsi's adverse actions.  Here, such an

inference cannot be drawn.  "The cases that accept mere temporal proximity between an

employer's knowledge of protected activity and an adverse employment action as sufficient

evidence of causality to establish a prima facie case uniformly hold that the temporal proximity

must be 'very close.'"  *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (citation

omitted).  A court may "exercise its judgment about the permissible inferences that can be drawn

from temporal proximity in the context of particular cases."  *Espinal v. Goord*, 558 F.3d 119,

129 (2d Cir. 2009).  A one-month gap between protected activity and adverse action may well be

sufficient to infer causation in certain cases; here, however, it appears unlikely that Pepsi, if it

truly were motivated to retaliate against an employee whose termination it already sought, would

have waited over a month for an opportunity to take further adverse action.  Moreover, within the

relevant one-month timeframe, Hardy strongly implied on Facebook that he intended to commit

worker's compensation fraud, Def. 56.1 Stmt. ¶ 53, and shortly thereafter, Pepsi amended its

arbitration demand, *id*. ¶ 54.   Taking the context of the case into account, as courts are permitted

to do in determining whether an inference may be drawn from temporal proximity alone, the almost immediate proximity between Hardy's Facebook post and Pepsi's amended arbitration demand presents a far more persuasive inference of causation.  Temporal proximity by itself, therefore, is insufficient to show the necessary causation between Hardy's protected activity on July 10, 2013 and Pepsi's amended arbitration demand on August 14, 2013.[11]

In short, Hardy has presented no evidence to satisfy the fourth element of a prima facie case of retaliation.

## CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment is GRANTED, and judgment is to be entered for the Defendant.  The Clerk of the Court is directed to terminate docket entry 31 and to terminate the case.  The Clerk of the Court is directed to mail a copy of this Opinion to Plaintiff and to note service on the docket.

**SO ORDERED.**

**Date:   March 31, 2016**
**New York, NY**

**VALERIE CAPRONI**
**United States District Judge**

---

[11]     Even if the Court were to find that a prima facie case of retaliation has been made as to the additional charges, Hardy still cannot survive Pepsi's motion for summary judgment.  As discussed above, under *McDonnell Douglas*, a plaintiff who establishes a *prima facie* case "shifts the burden to the defendant to articulate a legitimate, non-discriminatory reason for its conduct, at which point the burden shifts back to the plaintiff to show that defendant's explanations are a pretext for impermissible discrimination."  *Dotel v. Walmart Stores, Inc.*, 627 F. App'x 42, 42 (2d Cir. 2016) (citing *Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 714 (2d Cir. 1996)).  There is no evidence that Pepsi acted with retaliatory intent in amending its arbitration demand; it acted in direct response to strong evidence that Hardy lied to supervisors and attempted to commit worker's compensation fraud.  Hardy, further, has not attempted to show that this reason was pretext, beyond offering conclusory allegations during his deposition that he "was being set up."  Mingione Decl., Ex. 4, pt. 1, at 165.  Because Pepsi had a non-discriminatory reason to take further materially adverse action against Hardy, and Hardy has offered no evidence showing that this reason was pretextual, no question of fact exists as to whether Pepsi retaliated against him.